# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

THEODORE HAYES et al.,

Plaintiffs-Appellants,

v.

PHILIP E. HARVEY,

Defendant-Appellee.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania [District Court Case No. 2:15-CV-2617]

# BRIEF FOR THE UNITED STATES DEPARTMENT OF
# HOUSING AND URBAN DEVELOPMENT AS AMICUS CURIAE

CHAD A. READLER
  *Acting Assistant Attorney General*

WILLIAM M. MCSWAIN
  *United States Attorney*

MICHAEL S. RAAB
GERARD SINZDAK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7242*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-0718*

**TABLE OF CONTENTS**

Page

INTRODUCTION AND INTEREST OF THE DEPARTMENT
OF HOUSING AND URBAN DEVELOPMENT..........................................................1

STATEMENT OF THE ISSUE..........................................................................................1

STATEMENT OF THE CASE...........................................................................................2

    A.    Statutory Background..........................................................................................2

    B.    Procedural Background.......................................................................................8

SUMMARY OF ARGUMENT.........................................................................................11

ARGUMENT:
    Section 1437f(t) Provides Enhanced Voucher Holders
    With A Right To Remain In Their Housing Unit, Absent
    Good Cause For Eviction ..........................................................................................12

CONCLUSION ...............................................................................................................23

COMBINED CERTIFICATIONS

**Cases:**                                                                                          **Page(s)**

*Barnhart v. Walton,*
   535 U.S. 212 (2002) ...........................................................................................21

*Barrientos v. 1801-1825 Morton, LLC,*
   No. 06-cv-6437, 2007 WL 7213974 (C.D. Cal. Sept. 11, 2007),
   *aff'd on other grounds,* 583 F.3d 1197 (9th Cir. 2009) ........................................21

*Delaware Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs,*
   685 F.3d 259 (3d. Cir. 2012) ..........................................................................20-21

*Duncan v. Walker,*
   533 U.S. 167 (2001) ...........................................................................................16

*Estevez v. Cosmopolitan Assocs. LLC,*
   No. 05-CR-4318, 2005 WL 3164146 (E.D.N.Y. Nov. 28, 2005)................................21

*Feemster v. BSA Ltd. P'ship,*
   471 F. Supp. 2d 87, 93 (D.D.C. 2007), *aff'd in relevant part,*
   548 F.3d 1063 (D.C. Cir. 2008) .........................................................................21

*Hagans v. Commissioner of Soc. Sec.,*
   694 F.3d 287 (3d Cir. 2012) .................................................................20, 21, 22

*Hayes v. Harvey,*
   186 F. Supp. 3d 427 (E.D. Pa. 2016) ......................................................................9
   874 F.3d 98 (3d Cir. 2017), *vacated and reh'g en banc granted*
   878 F.3d 446 (3d Cir. Dec. 29, 2017) ...........................................................*passim*

*Jeanty v. Shore Terrace Realty Ass'n,*
   No. 03-CIV-8669, 2004 WL 1794496 (S.D.N.Y. Aug. 10, 2004) ..............................21

*Madison v. Resources for Human Dev., Inc.,*
   233 F.3d 175 (3d Cir. 2000) .................................................................................22

*North Haven Bd. of Educ. v. Bell,*
   456 U.S. 512 (1982) ...........................................................................................21

*Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust,*
  636 F.3d 1150 (9th Cir. 2011) ...................................................................... 3, 10, 21

*Riegel v. Medtronic, Inc.,*
  552 U.S. 312 (2008) ...................................................................................... 20

*Ross v. Blake,*
  136 S. Ct. 1850 (2016) .................................................................................. 15

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) .................................................................................. 11, 20

*Stone v. INS,*
  514 U.S. 386 (1995) ...................................................................................... 15

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,*
  135 S. Ct. 2507 (2015) .................................................................................. 15

*TRW Inc. v. Andrews,*
  534 U.S. 19 (2001) ........................................................................................ 14

*Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler,*
  537 U.S. 371 (2003) ...................................................................................... 20

**Statutes:**

Departments of Veterans Affairs and Housing and Urban
  Development, and Independent Agencies Appropriations Act, 1997,
  Pub. L. No. 104-204, 110 Stat. 2874 (1996) ............................................ 17, 18

Departments of Veterans Affairs and Housing and Urban
  Development, and Independent Agencies Appropriations Act, 2000,
  Pub. L. No. 106-74, 113 Stat. 1047 (1999) ................................................ 4, 16

Housing and Community Development Act of 1974,
  Pub. L. No. 93-383, § 201, 88 Stat. 634 (1974) ............................................ 22

Housing and Community Development Act of 1987,
  Pub. L. No. 100-242, § 262(a), 101 Stat. 1815 (1988) .................................... 3

United States Housing Act of 1937:

42 U.S.C. § 1437a(a)(1) ............................................................................3

42 U.S.C. § 1437f(a) ................................................................................2

42 U.S.C. § 1437f(b) ................................................................................2

42 U.S.C. § 1437f(c) ................................................................................3

42 U.S.C. § 1437f(c)(8)(A) .................................................................... 3, 19

42 U.S.C. § 1437f(c)(8)(B) .................................................................... 4, 19

42 U.S.C. § 1437f(f)(6) ............................................................................2

42 U.S.C. § 1437f(f)(7) ............................................................................2

42 U.S.C. § 1437f(o) ................................................................................2

42 U.S.C. § 1437f(o)(1)-(2) .....................................................................3

42 U.S.C. § 1437f(o)(2) ........................................................................ 2-3

42 U.S.C. § 1437f(o)(7)(C) .................................................................. 6, 10

42 U.S.C. § 1437f(t) ...................................................... 1, 4, 9, 10, 15

42 U.S.C. § 1437f(t)(1) ........................................................................ 6, 19

42 U.S.C. § 1437f(t)(1)(B) ..............................................................*passim*

42 U.S.C. § 1437f(t)(1)(B) (Supp. V 1999) ........................................ 5, 12

42 U.S.C. § 1437f(t)(1)(C) .......................................................................5

42 U.S.C. § 1437f(t)(2) ..........................................................................19


Pub. L. No. 106-246, § 2801 (2000) ....................................................6


12 U.S.C. § 1715z-1b ............................................................................6

**Regulations:**

24 C.F.R. § 886.309 ................................................................................2


24 C.F.R. § 886.311 ................................................................................2


24 C.F.R. § 982.1(a) ................................................................................2


24 C.F.R. § 982.1(b) ................................................................................2


24 C.F.R. § 982.1(b)(1) ............................................................................2


24 C.F.R. § 982.1(b)(1)-(2) ......................................................................2


24 C.F.R. § 982.310 ............................................................................ 6, 19


24 C.F.R. § 982.310(d)(iii) ......................................................................19

24 C.F.R. § 982.310(d)(iv) ....................................................................19

**Legislative Materials:**

H.R. Rep. No. 106-379 (1999)............................................................16

H.R. Rep. No. 106-521 (2000)............................................................15

H.R. Rep. No. 106-710 (2000)............................................................15

S. Rep. No. 104-318 (1996)....................................................3, 17, 18

S. Rep. No. 106-161 (1999)..................................................................16

**Other Authorities:**

Office of Pub. & Indian Hous., U.S. Dep't of Hous. & Urban
    Dev., *Notice PIH 2001-41 (HA): Section 8 Tenant-Based*
    *Assistance (Enhanced and Regular Housing Choice Vouchers)*
    *For Housing Conversion Actions—Policy and Processing*
    *Guidance* (Nov. 14, 2001),
    https://www.hud.gov/sites/documents/DOC_9111.PDF ........................................7

Tenant-Based Assistance: Enhanced Vouchers,
    81 Fed. Reg. 74,372 (Oct. 26, 2016) ....................................4, 8, 18

U.S. Dep't of Hous. & Urban Dev., *Section 8 Renewal Policy:*
    *Guidance for the Renewal of Project-Based Section 8*
    *Contracts*......................................................................................7, 8

## INTRODUCTION AND INTEREST OF THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

The United States Department of Housing and Urban Development (HUD) respectfully submits this brief in response to this Court's order of February 2, 2018, inviting the agency to address the scope of the enhanced voucher provision of Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f(t), and whether the provision requires property owners to continuously renew enhanced voucher tenancies.

HUD has long interpreted the enhanced voucher provision as providing eligible tenants with a right to remain in their housing units (provided that those units continue to be used as rental housing and remain otherwise eligible for rental assistance), such that the tenants may only be evicted for cause, even at the end of the lease term. Thus, the provision requires property owners to continuously renew enhanced voucher tenancies, unless the owner has cause for eviction, the owner no longer plans to offer the relevant units as rental housing, or the units are otherwise ineligible for housing assistance.

## STATEMENT OF THE ISSUE

Whether the enhanced voucher provision of the Section 8 housing program, 42 U.S.C. § 1437f(t), grants enhanced voucher tenants a right to remain in their unit such that the tenants may only be evicted for cause, even at the end of a lease term.

## STATEMENT OF THE CASE

### A.      Statutory Background

Congress enacted the Section 8 housing program "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). Through the Section 8 program, HUD provides rental assistance to low-income families. *See id.*

In general, there are two types of Section 8 assistance: "project-based" assistance and "tenant-based" assistance. 24 C.F.R. § 982.1(b)(1). Project-based assistance is tied to specific housing units. *Id.*; *see also* 24 C.F.R. § 886.309. Owners of such units enter into long-term contracts with HUD, under which they agree to rent the units to low-income families who meet Section 8 eligibility requirements in exchange for rental assistance payments from the government. *See* 24 C.F.R. § 886.311; 42 U.S.C. § 1437f(b), (f)(6). Tenant-based assistance is tenant-specific and travels with the tenant if the tenant moves. 24 C.F.R. § 982.1(b)(1)-(2); *see also* 42 U.S.C. § 1437f(o), (f)(7). In essence, HUD provides vouchers which eligible tenants can use to pay the rent at the unit of their choosing. *See* 24 C.F.R. § 982.1(b); 42 U.S.C. § 1437f(f)(7). The tenant-based Section 8 program is known as the "Housing Choice Voucher Program." 24 C.F.R. § 982.1(a).

Under both forms of assistance, tenants are required to pay a statutorily prescribed portion of the rent, typically equal to thirty percent of the tenant family's "adjusted income" or ten percent of their gross income, whichever is greater. 42

U.S.C. § 1437f(o)(2); *see also id.*§ 1437a(a)(1).  The federal government pays the balance

of the rent, up to a statutorily capped amount (known as the "payment standard"

under the Housing Choice Voucher Program).  *See id.* § 1437f(c), (o)(1)-(2).

Beginning in the late 1980s, the long-term, project-based assistance contracts

between project owners and HUD began to expire in large numbers.  Congress feared

that owners would decline to renew the contracts and would then raise rents to

market-based rates that exceeded the relevant payment standard, resulting in low-

income tenants being forced out.  *See Park Village Apartment Tenants Ass'n v. Mortimer

Howard Trust*, 636 F.3d 1150, 1152-53 (9th Cir. 2011); *see also, e.g.,* S. Rep. No. 104-318,

at 33 (1996) (expressing concern over "the disruptive and painful effects of

displacement that families may confront" as a result of "expiring rental subsidy

contracts").  Congress therefore enacted a series of bills designed to protect tenants

when owners of project-based-assistance units opted out of their contracts.

In 1988, Congress enacted a requirement that owners provide tenants and

HUD with notice of the owners' intent not to renew their expiring assistance

contracts.  *See* Housing and Community Development Act of 1987, Pub. L. No. 100-

242, § 262(a), 101 Stat. 1815, 1890 (1988).  In its current form, the notice provision

requires owners to provide tenants and HUD with at least one year's notice that the

owner intends to opt out of his or her project-based assistance contract.  42 U.S.C.

§ 1437f(c)(8)(A).  Moreover, "the owner may not evict the tenants or increase the

tenants' rent payment until such time as the owner has provided the notice and 1 year has elapsed." *Id.* § 1437f(c)(8)(B).

In the late 1990s, Congress provided additional protections to tenants through the introduction of the "enhanced voucher" program, as set forth in 42 U.S.C. § 1437f(t). *See* Departments of Veterans Affairs and Housing and Urban Development, Independent Agencies Appropriations Act, 2000, Pub. L. No. 106-74, § 538, 113 Stat. 1047, 1122 (1999) (2000 Appropriations Act); *see also* Tenant-Based Assistance: Enhanced Vouchers, 81 Fed. Reg. 74,372, 74,373 n.2 (Oct. 26. 2016) (describing the statutory history of enhanced voucher program, which culminated in the introduction of § 1437f(t) in 1999). Whereas Housing Choice vouchers cover the difference between a tenant's statutorily prescribed contribution to the rent and the applicable payment standard, enhanced vouchers cover the difference between the tenant's required contribution and the rent an owner charges after opting out of the project-based assistance program (*i.e.*, the market rent), which is typically higher than the payment standard. *See* 42 U.S.C. § 1437f(t)(1)(B). HUD is required to provide enhanced vouchers to tenants who are living in a project-based assistance unit on the date of an "eligibility event," which includes the date the owner of the unit's project-based assistance contract with HUD expires and is not renewed. *See id.* § 1437f(t)(1)(b), (2); *see also* 2000 Appropriations Act, § 531(a) (codified as amended at 42 U.S.C. § 1437f note) ("In the case of a contract for project-based assistance under section 8 for a covered project that is not renewed. . ., upon the date of the expiration

of such contract the Secretary shall make enhanced voucher assistance . . . available on behalf of each low-income family who, upon the date of such expiration, is residing in an assisted dwelling unit in the covered project.").

An enhanced voucher converts to an ordinary voucher if the family moves from the relevant unit or allows another family to use the voucher. 42 U.S.C. § 1437f(t)(1)(C). Enhanced vouchers are thus tied both to specific units (a unit formerly subject to project-based assistance) and specific tenants (the family who occupied that unit on the date the owner's project-based-assistance contract expired).

When it was first enacted in 1999, the statutory provision at issue here, 42 U.S.C. § 1437f(t)(1)(B), provided that:

> during any period that the assisted family continues residing in the same project in which the family was residing on the date of the eligibility event for the project, if the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time), subject to paragraph (10)(A) of subsection (o)[.]

42 U.S.C. § 1437f(t)(1)(B) (Supp. V 1999).

Just one year later, Congress amended the provision. It now provides:

> [T]he assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project, and if, during any period the family makes such an election and continues to so reside, the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) of this section for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment

standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time), subject to paragraph (10)(A) of subsection (o) of this section and any other reasonable limit prescribed by the Secretary, except that a limit shall not be considered reasonable for purposes of this subparagraph if it adversely affects such assisted families[.]

42 U.S.C. § 1437f(t)(1)(B); Pub. L. No. 106-246, § 2801 (2000). This appeal centers on the import of the provision's first clause, added by Congress in 2000, that states that "the assisted family may elect to remain" in the unit where the family lived on the date the owner's project-based-assistance contract expired.

HUD has long interpreted § 1437f(t)(1)(B), as amended by Congress in 2000, as providing enhanced voucher tenants with a qualified right to remain in their units (provided that the relevant units continue to be offered as rental housing and remain otherwise eligible for rental assistance), such that they may not be evicted at the end of a lease term absent good cause.[1] As the agency has explained, under § 1437f(t)(1)(B),

---

[1] The statutory provisions and regulations governing the Housing Choice Voucher Program generally apply to the enhanced voucher program, *see* 42 U.S.C. § 1437f(t)(1). Thus, enhanced voucher tenants, like Housing Choice voucher tenants, may be evicted "for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause." *Id.* § 1437f(o)(7)(c); *see also* 12 U.S.C. § 1715z-1b (stating that the lease for an enhanced voucher unit must include a "good cause" eviction clause). HUD has defined the grounds for eviction in 24 C.F.R. § 982.310, which include, but are not limited to, an enhanced voucher tenant's failure to pay their share of the rent, a tenant's criminal activity, a tenant's destruction of the owner's property, the owner's desire to use the unit for personal or family use, and a business or economic reason for termination of the tenancy (such as a desire to renovate the unit).

> A family that receives an enhanced voucher has the right to remain in the project as long as the units are used for rental housing and are otherwise eligible for housing choice voucher assistance (e.g., the rent is reasonable, unit meets HQS, etc.). The owner may not terminate the tenancy of a family that exercises its right to remain except for a serious or repeated lease violation or other good cause. If an owner refuses to honor the family's right to remain, the family may exercise any judicial remedy that is available under State and/or local law.

Office of Pub. & Indian Hous., U.S. Dep't of Hous. & Urban Dev., *Notice PIH 2001-41 (HA): Section 8 Tenant-Based Assistance (Enhanced and Regular Housing Choice Vouchers) For Housing Conversion Actions—Policy and Processing Guidance* 26 (Nov. 14, 2001) (PIH 2001-41 Notice);[2] *see also* J.A. 297. A tenant's right to remain "continues after the first lease term" and requires owners to "continually renew the lease of an enhanced voucher family," absent good cause for eviction. *See* U.S. Dep't of Hous. & Urban Dev., *Section 8 Renewal Policy: Guidance for the Renewal of Project-Based Section 8 Contracts*, § 11-3, B.2 (Feb. 15, 2008) (2008 Renewal Policy) (JA 253).

HUD's interpretation of § 1437f(t)(1)(B) is longstanding and consistent. HUD first set forth its understanding of § 1437f(t)(1)(B) in guidance documents issued in 2001, shortly after Congress enacted the current version of the provision. *See* PIH 2001-41 Notice at 26; J.A. 297; U.S. Dep't of Hous. & Urban Dev., *Section 8 Renewal Policy: Guidance for the Renewal of Project-Based Section 8 Contracts*, ch. 11 (Jan. 19, 2001). The agency reiterated its view in subsequent guidance documents issued to owners and local housing authorities. *See, e.g.*, 2008 Renewal Policy (J.A. 249-56); 2015

---

[2] Available at: https://www.hud.gov/sites/documents/DOC_9111.PDF

Renewal Policy (J.A. 257-69); Letter from Michael Dennis, Dir., Office of Housing Voucher Programs, to Exec. Dir., Public Housing Agencies (May 22, 2014) (J.A. 270-71) ("[F]amilies have the 'right to remain' pursuant to section 8(t) [of] the Act, and . . . this 'right to remain' extends beyond the initial year of assistance."); Mem. from Benjamin T. Metcalf, Deputy Assistant Sec'y for Multifamily Hous. Programs, to Multifamily Project Owners (June 5, 2014) (J.A. 272-73). HUD has also asserted its view in court filings. *See* U.S. Amicus Br. at 9 & n.4, *Barrientos v. 1801-1825 Morton, LLC*, 583 F.3d 1197 (9th Cir. 2009). In 2016, the agency issued a proposed regulation that would codify its established interpretation. *See* Tenant-Based Assistance: Enhanced Vouchers, 81 Fed. Reg. 74,372, 74,374-75 (Oct. 26. 2016). That regulation remains pending.

## B.  Procedural Background

The plaintiffs in this case were residing in a project-based-assistance unit when, on January 17, 2009, the unit's owner (Pine Street Associates) declined to renew its project-based-assistance contract. *Hayes v. Harvey*, 874 F.3d 98, 101 (3d Cir. 2017), *vacated and reh'g en banc granted* 878 F.3d 446 (3d Cir. Dec. 29, 2017). Plaintiffs elected to remain in the unit and began receiving enhanced vouchers. *Id.* Later that year, Pine Street Associates sold the unit to defendant Phillip Harvey. *Id.* at 101-102. Harvey entered into a lease with plaintiffs (and a related contract with the local housing authority) in which he agreed to accept the enhanced vouchers towards plaintiffs' rent. *Id.* at 102.

8

In early 2015, Harvey notified plaintiffs that he would not renew their lease upon its expiration in April 2015. *Hayes*, 874 F.3d at 102. In response, plaintiffs filed this lawsuit, arguing that they had a right to remain in the unit under § 1437f(t)(1)(B) and seeking an injunction barring their eviction. Harvey asserted that § 1437f(t)(1)(B) did not limit his ability to evict plaintiffs upon the expiration of their lease. The district court agreed with Harvey, concluding that § 1437f(t) does not "impos[e] any continued obligation on the owner to remain in the [Section 8] program or to continue renting to said tenant in situations where the lease has expired." *Hayes v. Harvey*, 186 F. Supp. 3d 427, 435 (E.D. Pa. 2016).

On appeal, this Court affirmed in a 2-1 decision. *See Hayes*, 874 F.3d at 100. The majority concluded that § 1437f(t)(1)(B) obligates HUD to provide enhanced vouchers to families who elect to remain in their dwelling units after an owner opts out of a project-based assistance contract, but imposes no limits on an owner's right to evict tenants at the end of a lease term. *See Hayes*, 874 F.3d at 105. The majority reasoned that the statute was silent as to an owner's renewal obligations and stated that "[h]ad Congress intended to require property owners to continually renew enhanced-voucher tenancies, . . . it would have said so clearly." *Id.* at 107. The majority also emphasized that a rule requiring an owner to renew an enhanced voucher lease "would be a significant departure from the ordinary voucher provision, which does not, in any way, limit property owners' nonrenewal rights." *Id.* at 106 (citing 42 U.S.C. § 1437f(o)(7)(C)).

9

Writing in dissent, Judge Greenaway would have held that § 1437f(t)(1)(B) grants enhanced voucher tenants a right to remain in their dwelling units and "obligat[es] landlords to renew the leases of enhanced voucher-holders unless there is good cause to terminate the tenancy." *Hayes*, 874 F.3d at 117. Judge Greenaway concluded that, "as a purely textual matter," § 1437f(t)(1)(B) grants "the assisted family" a right to remain and that that right "necessarily limits the rights of a landlord." *Hayes*, 874 F.3d at 113-15. He also stressed that the majority's interpretation of § 1437f(t)(1)(B) as solely obligating HUD to provide enhanced vouchers to the relevant tenants rendered Congress's addition of the "elect to remain" language superfluous, and noted that the majority's interpretation was at odds with HUD's longstanding view of the statute, with the Ninth Circuit's decision in *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150 (9th Cir. 2011), and with the decisions of every district court (other than the district court in this case) to consider the question of § 1437f(t)(1)(B)'s scope. *Hayes*, 874 F.3d at 120-22.

This Court subsequently granted rehearing en banc. En Banc Order (Dec. 29, 2017). On February 2, 2018, the Court issued an order inviting HUD to file an amicus brief addressing "the scope of the enhanced voucher provision of the United States Housing Act of 1937, 42 U.S.C. Section 1437f(t), and whether its 'right to remain' provision requires property owners to continuously renew enhanced voucher tenancies." Amicus Invitation Order (Feb. 2, 2018).

## SUMMARY OF ARGUMENT

Since § 1437f(t)(1)(B) was enacted in its current form in 2000, HUD has interpreted the provision as providing enhanced voucher tenants with a right to remain in their housing units, such that they may not be evicted at the end of a lease term absent good cause (assuming the relevant units continue to be offered as rental housing and remain otherwise eligible for rental assistance). HUD's longstanding view of the enhanced voucher provision is consistent with the statute's text, history, and purpose. In particular, HUD's interpretation gives meaning to § 1437f(t)(1)(B)'s first clause—which states that assisted families who receive enhanced vouchers "may elect to remain" in their housing units—and avoids rendering Congress's 2000 amendment of the statute (which added the clause) superfluous.

HUD's interpretation of the enhanced voucher provision is entitled to considerable weight under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). HUD's position is a reasonable interpretation of the statute, as evidenced by the fact that every federal court to address the scope of § 1437f(t)(1)(B) prior to the district court in this case reached the same conclusion as the agency. Deference to HUD's view is also warranted because the agency adopted its interpretation of the statute contemporaneously with the provision's enactment and has consistently adhered to that interpretation in the nearly two decades since. HUD's expertise in administering the complex Section 8 housing program and the need for national uniformity in the

11

administration of that program also indicate that the agency's view is entitled to significant respect.

## ARGUMENT

### Section 1437f(t) Provides Enhanced Voucher Holders With A Right To Remain In Their Housing Unit, Absent Good Cause For Eviction

**A.**  As originally enacted in 1999, § 1437f(t)(1)(B) provided that, "during any period that the assisted family continues residing in the same project in which the family was residing on the date of the eligibility event for the project," HUD would use the rental price of the family's unit as the payment standard for calculating the family's rental assistance, rather than the typically lower Housing Choice Voucher Program payment standard.  42 U.S.C. § 1437f(t)(1)(B) (Supp. V 1999).  The following year, Congress amended the provision to say that "the assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project, and if, during any period the family makes such an election and continues to so reside," HUD will use the enhanced payment standard. *Id.* § 1437f(t)(1)(B) (2000).

As Judge Greenaway explained in his dissent, the "may elect to remain" clause by its plain text provides the assisted family with the right to remain in their homes if they so choose.  *Hayes v. Harvey*, 874 F.3d 98, 114-117 (3d Cir. 2017), *vacated and reh'g en banc granted* 878 F.3d 446 (3d Cir. Dec. 29, 2017).  That interpretation is confirmed by § 1437f(t)(1)(B)'s statutory history.  Congress added the "may elect to remain" clause

in 2000.  Interpreting the clause as granting assisted families a right to remain gives both the clause and the amendment meaning; alternative interpretations, which treat the clause as a mere stage-setter, render Congress's express addition a nullity.

HUD's interpretation of § 1437f(t)(1)(B) as providing enhanced voucher recipients with a right to remain that extends beyond the expiration of their lease is consistent with the statute's text and structure.  *See Hayes*, 874 F.3d at 113-14.  Section 1437f(t)(1)(B) states that "the assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event" and that, in the event the assisted family makes such an election, HUD will provide the family with an enhanced voucher that covers the difference between the family's market-based rent and the family's required rent contribution.  Section 1437f(t)(1)(B) is thus framed in terms of the rights of the assisted family.  Congress granted the assisted family the authority to choose to remain in the same unit or project where the family was residing on the date they became eligible for an enhanced voucher.  Congress then separately required HUD to make enhanced rental assistance payments in the event "the family" exercises that power.  Moreover, the authority Congress granted enhanced voucher tenants to "elect to remain" in their housing units necessarily limits a landlord's ability to evict the tenants at will at the end of a lease.  A tenant's right to "elect to remain" in their housing unit would be meaningless if the unit's owner retained the unfettered authority to decline to renew the tenant's lease.

HUD's interpretation of § 1437f(t)(1)(B) also gives the provision's first clause meaning, whereas other interpretations render the clause superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). Section 1437f(t)(1)(B) contains two clauses. The first states that an assisted family may elect to remain in its unit; the second then states that, if the family makes such an election, it will receive enhanced rental assistance. 42 U.S.C. § 1437f(t)(1)(B). If the first clause merely reflects the truism that tenants do not always move upon expiration of their lease, then the clause serves no purpose. Indeed, in setting forth HUD's obligations in the event the assisted family chooses to "continue[] to . . . reside" in its housing unit, the provision's second clause itself reflects the fact that families often choose to remain in their units after the expiration of an initial lease term, rendering the first clause entirely unnecessary. *Id.*

The panel majority's interpretation of § 1437f(t)(1)(B) as speaking solely to HUD's obligations, *see Hayes*, 874 F.3d at 105, similarly fails to give the first clause independent meaning. The statute's second clause covers HUD's obligations in full. Under the panel majority's interpretation, the first clause, which is not directed at HUD and does not obligate the agency to take any action, is without any function.

In addition to violating a basic canon of statutory construction, an interpretation of § 1437f(t)(1)(B) that renders its first clause meaningless cannot be squared with the provision's statutory history. As noted *supra* pp. 5-6, Congress added the clause when it amended § 1437f(t) in 2000, one year after the provision was introduced. "When Congress amends legislation, courts must 'presume it intends [the change] to have real and substantial effect.'" *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995)); *see also, e.g.*, *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2520–21 (2015) (rejecting interpretation of a statute that would render amendments to the statute superfluous). And, indeed, the congressional committee that inserted the additional clause made clear that it intended the clause to have a real effect; it added the clause to "clarif[y] that assisted families continue to have the right to elect to remain in the same unit of their project if that project is eligible to receive enhanced vouchers." H.R. Rep. No. 106-521, at 42-43 (2000); *see also* H.R. Rep. No. 106-710, at 164 (2000) (Conf. Report) (report on 2000 amendment) (noting that the amendment was intended to "clarif[y] the intent" of the enhanced voucher provision). Unlike other interpretations, HUD's interpretation of § 1437f(t)(1)(B)'s first clause gives Congress's 2000 amendment meaning and accords with Congress's intent to provide enhanced voucher tenants with a right to remain in their former project-based-assistance units.

Section 1437f(t)(1)(B)'s statutory history also negates the panel majority's view of § 1437f(t)(1)(B) as merely setting forth HUD's obligation to provide enhanced

vouchers to tenants who remain in their former units after an owner opts out of his or her project-based-assistance contract. *See Hayes*, 874 F.3d at 105. When Congress first enacted § 1437f(t) in 1999, it separately amended § 524(d) of the Multifamily Assisted Housing Reform and Affordability Act of 1997 to require HUD to provide enhanced vouchers to eligible families. *See* Pub. L. No. 106-74, § 531, 113 Stat. 1047, 1109 (1999) (codified as amended at 42 U.S.C. § 1437f note). Thus, HUD was obligated to provide enhanced vouchers to eligible families before the 2000 amendment that added § 1437f(t)(1)(B)'s first clause. If all § 1437f(t)(1)(B) does is establish HUD's obligation to provide enhanced vouchers to eligible families, then the 2000 amendment was pure surplusage.

Interpreting § 1437f(t)(1)(B) as providing tenants with a right to remain in their housing units absent cause for eviction is also consistent with Congress's purpose in creating the enhanced voucher program. Congress authorized HUD to offer enhanced vouchers to tenants in expiring project-based assistance units for the purpose of "allow[ing] tenants to continue to maintain their homes where the owners of their rental units have raised rents after rejecting the renewal of project-based contracts." S. Rep. No. 106-161, at 62 (1999). Congress deemed it "especially . . . important" that elderly and disabled tenants not be involuntarily displaced and instead have the ability "to age in place." *Id.*; *see also* H.R. Rep. No. 106-379, at 169 (Conf. Rep.) (1999) (stating that the newly created § 1437f(t) would "protect[] existing residents of Federal-assisted housing from being forced to move from their homes").

16

Similarly, when Congress first authorized HUD to issue enhanced vouchers (in connection with the prepayment by property owners of certain federally subsidized mortgages), it did so to "preserv[e] and protect[] existing housing developments for low-income families, and the elderly, and the disabled" and "to prevent the involuntary displacement" of such individuals and families. *See* Departments of Veterans Affairs and Housing & Urban Development, and Independent Agencies Appropriations Act, 1997, Pub. L. No. 104-204, 110 Stat. 2874, 2882-83 (1996); *see also* S. Rep. No. 104-318, at 30 (describing the "avoidance of involuntary displacement of currently assisted families" as a Congressional "priority"). HUD's conclusion that § 1437f(t)(1)(B) provides enhanced voucher tenants with a right to remain in their housing units at the end of a lease term is consistent with these Congressional goals.

In concluding that the enhanced voucher provision does not limit an owner's authority to evict enhanced voucher tenants at the end of a lease term, the panel majority found it significant that owners participating in the ordinary Housing Choice Voucher Program may evict tenants without cause at the end of a lease. *See Hayes*, 874 F.3d at 106 (Recognizing a right to remain for enhanced voucher holders "would be a significant departure from the ordinary voucher provision which does not, in any way, limit property owners' renewal rights."). But the Housing Choice and enhanced voucher programs differ in ways that justify the distinction. The enhanced voucher program arises out of the project-based and other long-term assistance programs, through which the federal government provided long-term financial aid for the

17

construction and maintenance of particular housing projects. Owners of housing units that are part of the enhanced voucher program thus received extensive financial assistance from the federal government (in the form of years-long rental assistance payments and/or subsidized mortgages and insurance) for those units. *See* 81 Fed. Reg. at 74,372-73 (describing the eligibility events that trigger the enhanced voucher provision); *see also* supra pp. 2-3 (describing the project-based assistance program). By contrast, Housing Choice vouchers travel with the tenant, are not used to fund specific units, and can be used to rent any privately owned unit. Congress could have reasonably concluded that the federal government's long-term investment in the project-based assistance units that become enhanced-voucher units justifies placing a limit on an owner's right to displace the individuals who were living in the units at the time the owner prepaid his mortgage or opted out of his long-term assistance contract. And, indeed, when it first created the enhanced voucher program, Congress indicated that it was doing so in part to "protect[] the [government's] massive previous investment in public housing." S. Rep. No. 104-318, at 30; *see also* Pub. L. No. 104-204 (creating the first enhanced voucher program under the heading "Preserving Existing Housing Investment").

Moreover, as explained *supra* pp. 3-4, under the Housing Choice Voucher Program, HUD pays the difference between a tenant's statutorily prescribed contribution to the rent and the payment standard. Under the enhanced voucher program, HUD pays the difference between the tenant's contribution and the market-

rate rent, which is typically higher than the payment standard. Congress could well have determined that providing owners of enhanced-voucher units with a subsidy up to the market rate (thus ensuring that the owners receive the market-rate rent) justified placing a limitation on the owner's right to evict enhanced voucher holders that was not warranted under the Housing Choice voucher program.[3]

Contrary to the panel majority's suggestion, *Hayes*, 874 F.3d at 104, the statutory provision requiring an owner to notify tenants and HUD of the owner's intent to opt out of a project-based assistance contract, 42 U.S.C. § 1437f(c)(8)(A), is not inconsistent with HUD's interpretation of § 1437f(t)'s "right to remain" provision. Under the notice provision, an owner must provide HUD and tenants with one year's notice that the owner intends to opt out of his or her projected-based assistance contract. *See* 42 U.S.C. § 1437f(c)(8)(A). During that year, "the owner may not evict the tenants or increase the tenants' rent payment." *Id.* at § 1437f(c)(8)(B). The enhanced voucher provision and its associated protection from eviction are not applicable until the owner's project-based assistance contract terminates, which is typically at the end of the notice period. *See* 42 U.S.C. § 1437f(t)(1), (2) (enhanced voucher assistance applies "on the date of [an] eligibility event"; "eligibility event[s]"

---

[3] As noted supra p. 6, HUD has set forth a non-exclusive list of grounds for eviction in 24 C.F.R. § 982.310, which includes eviction for renovation or family use. If on remand defendant Harvey establishes that the eviction here was in fact for such a purpose, then he would have good cause to evict under the agency's regulations. *See* 24 C.F.R. § 982.310(d)(iii), (iv).

include "the termination or expiration of [an owner's] contract for [project-based] rental assistance"). Thus, the notice provision provides tenants with protection from an eviction without cause during the notice period, while the enhanced voucher's right to remain provision, 42 U.S.C. § 1437f(t)(1)(B), provides such protection following the termination of the owner's contract with HUD. In other words, while the notice period provides protection from rent increases only until the end of the period, it provides protection from eviction until then, at which point the enhanced voucher provision's eviction protection applies.

   **B.** Although not binding on this Court, HUD's interpretation of § 1437f(t)(1)(B) is entitled to significant weight under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 387 (2003) (granting *Skidmore* deference to agency guidance); *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 338 n.8 (2008) (noting that an agency's "amicus brief interpreting a statute" may be accorded deference under *Skidmore*). The weight a court accords an agency position under *Skidmore* depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140. "[T]he most important considerations are whether the agency's interpretation 'is consistent and contemporaneous with other pronouncements of the agency and whether it is reasonable given the language and purpose of the Act.' " *Hagans v. Commissioner of Soc. Sec.*, 694 F.3d 287, 304 (3d Cir.

2012) (quoting *Delaware Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 284 (3d. Cir. 2012)).  Courts "accord particular deference to an agency interpretation of 'longstanding' duration."  *Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (quoting *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 522 n. 12 (1982)).

Under these factors, HUD's longstanding interpretation of § 1437f(t)(1)(B) is entitled to considerable weight.  For the reasons explained above, HUD's interpretation of § 1437f(t)(1)(B) is "reasonable given the language and purpose of the Act."  *Hagans*, 694 F.3d at 304.  Indeed, the reasonableness of HUD's interpretation is underscored by the fact that, prior to this case, every federal court to address the scope of § 1437f(t)(1)(B) reached the same conclusion as the agency.  *See Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1157 (9th Cir. 2011) ("We therefore hold that § 1437f(t) provides tenants a right to remain in their rental units absent just cause for eviction."); *Barrientos v. 1801-1825 Morton, LLC*, No. 06-cv-6437, 2007 WL 7213974, at *6, *8 (C.D. Cal. Sept. 11, 2007), *aff'd on other grounds*, 583 F.3d 1197 (9th Cir. 2009); *Feemster v. BSA Ltd. P'ship*, 471 F. Supp. 2d 87, 93 (D.D.C. 2007), *aff'd in relevant part*, 548 F.3d 1063 (D.C. Cir. 2008); *Estevez v. Cosmopolitan Assocs. LLC*, No. 05-CR-4318, 2005 WL 3164146, at *5-6 (E.D.N.Y. Nov. 28, 2005); *Jeanty v. Shore Terrace Realty Ass'n*, No. 03-CIV-8669, 2004 WL 1794496, at *5 (S.D.N.Y. Aug. 10, 2004).

Moreover, HUD first promulgated its interpretation of § 1437f(t) contemporaneously with the provision's enactment (as amended in 2000) and has not

wavered from that interpretation in the nearly two decades since, two factors that lend further weight to the agency's position.  *See supra* pp. 6-8; *Hagans*, 694 F.3d at 305 (concluding that the Social Security Administration's interpretation of a statutory provision was entitled to a "fairly high level of deference on the *Skidmore* scale" because, among other things, the agency "consistently applied this policy during the past 20 years"); *Madison v. Resources for Human Dev., Inc.*, 233 F.3d 175, 187 (3d Cir. 2000) ("[A]gency interpretations issued contemporaneous with a statute are entitled to greater deference.").  HUD's expertise in managing the complex Section 8 and related public housing assistance programs and the need for national uniformity in the administration of those programs also counsel in favor of awarding the agency's interpretation of the enhanced voucher provision substantial deference. *See Hagans*, 694 F.3d at 305 (citing "the relative expertise of the SSA in administering a complex statutory scheme" and the need for national "uniformity" in such an administrative scheme as reasons to defer to the agency's statutory interpretation); *see also* Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201, 88 Stat. 634, 653-67 (1974) (creating the Section 8 program and tasking the Secretary of HUD with its administration).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

CHAD A. READLER
*Acting Assistant Attorney General*

WILLIAM M. MCSWAIN
*United States Attorney*

MICHAEL S. RAAB
*s/ Gerard Sinzdak*
GERARD SINZDAK
*Attorneys, Appellate Staff*
*Civil Division, Room 7242*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-0718*
*gerard.j.sinzdak@usdoj.gov*

April 2018

## COMBINED CERTIFICATIONS

1.  Government counsel are not required to be members of the bar of this Court.

2.  This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's February 2, 2018 Order because it contains 5,815 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

3.  On April 23, 2018, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

4.  The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

5.  This document was scanned for viruses using Microsoft Forefront Client Security and no virus was detected.

*s/ Gerard Sinzdak*
Gerard Sinzdak